## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY

|  |  |
|---|---|
| L.H., an individual, | |
| Plaintiff, | |
| v. | Case No.:  3:22-CV-625-CHB |
| RED ROOF INN, INC.; WYNDHAM HOTELS AND RESORTS, INC; and CLUB NO, INC., | |
| Defendants. | **JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW the Plaintiff L.H., by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## INTRODUCTION

1.      For years, sex trafficking ventures have brazenly operated in and out of hotels throughout this country. Criminals parade their misconduct openly on hotel properties throughout the United States while the hotels and hospitality industry remain willfully blind to the criminal misconduct to continue earning a profit at the expense of human life, human rights, and human dignity.

2.      Defendants, Red Roof Inn, Inc. ("RRI"), Club NO, Inc. ("Club NO"), and Wyndham Hotels & Resorts, Inc. ("Wyndham") know and have known for more than a decade that sex trafficking repeatedly occurs under their flag throughout the country. Rather than taking timely and effective measures to thwart this epidemic Defendants have instead chosen to ignore the open and obvious presence of sex trafficking on their properties, enjoying the profit from rooms rented for this explicit and apparent purpose.

3.     This action for damages is brought by the Plaintiff (hereinafter identified by her initials "LH."), a survivor of sex trafficking under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

4.     L.H. met her traffickers in Louisville, Kentucky in 2018. She was 16 years old and had recently run away from a group home. She was befriended by an adult male who led her to believe he could help her, but instead forced her to sexually service paying strangers while enduring brutal physical abuse, rape, exploitation, psychological torment, kidnapping, and imprisonment at the Defendants' hotels from approximately early January to early February 2018.

5.     The Plaintiff now brings this action for damages against the Defendants listed herein. Each of the Defendants, in violation of 18 U.S.C. §1595, knowingly benefited from facilitating a venture that they knew, or at the very least should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

6.     L.H. was advertised on Backpage.com and escorts.com, abused, and exploited at hotels across the Louisville area, including the Red Roof Inn®, Louisville Manor Adult Hotel, and the Baymont Hotel.

7.     As a direct and proximate result of Defendants' consistent refusals to prevent human trafficking on their hotel properties, L.H. was sex trafficked, sexually exploited, and victimized repeatedly at the Red Roof Inn®, Louisville Manor Adult Hotel, and the Baymont Hotel.

8.     The Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act 18 U.S.C. §1595, against the Defendants who enabled, harbored, held, facilitated, and financially benefited from a sex trafficking venture in which L.H. was trafficked for the purpose of commercial sex, sexually exploited, and brutally victimized in violation of 18 U.S.C. §1591(a).

## PARTIES

9.     The Plaintiff was 16 years old when she was first sold for sex and trafficked in for the purposes of commercial sex. The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102(15) and 18 U.S.C. §1591(a), and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102(14).

10.     Defendant RRI is one of the largest hotel franchisors in America and offers public lodging services through its affiliates, subsidiaries, and franchisees.

11.     Upon information and belief, RRI is a Delaware corporation with its headquarters in New Albany, Ohio and can be served by its registered agent Corporation Service Company, located at 251 Little Falls Drive, Wilmington, DE 19808.

   a.   The Red Roof Inns located at 3322 Red Roof Inn Place, Louisville, KY 40218 and, to the best of Plaintiff's recollection, 4704 Preston Highway, Louisville, KY 40213 are RRI hotels.

   b.   As a hotel operator, RRI controls the training and policies for its hotels including the Red Roof Inn® locations where L.H. was trafficked.

   c.   RRI maintains that it "values all of [its] guests, while providing a caring, comfortable environment for them."[1]

   d.   By and through its relationship with the staff at the Red Roof Inn® hotel properties where L.H. was trafficked and the hotel guest perpetrator who trafficked her at the Red Roof Inn®, RRI knowingly benefited, or received something of value, from its facilitation of, or participation in, a venture which it knew or should have known to engage in sex trafficking.

-----
[1] https://www.redroof.com/why-red-roof/

e.   Upon information and belief, RRI receives a percentage of the gross room revenue from the money generated by the operations of all Red Roof Inn® hotels, including a percentage of the revenue generated from the rate charged for the rooms in which the Plaintiff was sex trafficked.

f.   Upon information and belief, RRI owns, supervises, and/or operates the Red Roof Inn at 3322 Red Roof Inn Place, Louisville, KY 40218 and 4704 Preston Highway, Louisville, KY 40213 under its Red Roof Inn® brand.

g.   RRI is subject to the jurisdiction of this Court because it regularly transacts business in Kentucky, operates dozens of hotels in Kentucky, contracts to supply services in Kentucky, caused indivisible injuries to the Plaintiff in Kentucky, and knowingly profited from an illegal sex trafficking venture at the Red Roof Inn® at 3322 Red Roof Inn Place and 4704 Preston Highway, Louisville, KY 40213 in Louisville, KY.

12.   Defendant Wyndham Hotels and Resorts, Inc. (hereinafter "Wyndham") is another of the world's largest hotel companies and offers public lodging services directly or through its affiliates, subsidiaries, and franchisees. It is a Delaware corporation with its headquarters in Parsippany, New Jersey and can be served by its registered agent Corporate Creations Network Inc., 3411 Silverside Road, Suite 104, Wilmington, Delaware 19810.

a.   Defendant Wyndham Hotels and Resorts, Inc. is the successor entity to Wyndham Worldwide Corporation and retains successor liability for the wrongful acts of the predecessor.

b.   Baymont® brand hotels are Wyndham hotels.

c.   As a hotel operator, Defendant Wyndham controls the training and policies for its hotels including the Baymont® hotel where L.H. was trafficked.

d.  Defendant Wyndham maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with Wyndham brand standards and all local, state, and federal laws.[2]

e.  By and through its relationship with the staff at the Baymont® hotel where L.H. was trafficked and the hotel guest perpetrator who trafficked her at the Baymont® hotel, Defendant Wyndham knowingly benefited, or received anything of value, from its facilitation of, or participation in, a venture which it knew or should have known to engage in sex trafficking.

f.  Wyndham receives a percentage of the gross room revenue from the money generated by the operations of all Travelodge® hotels, including a percentage of the revenue generated from the rate charged for the rooms in which the Plaintiff was sex trafficked.

g.  Wyndham owns, supervises, and/or operates the Baymont® Hotel at 6515 Signature Drive, Louisville, KY 40213.

h.  Wyndham is subject to the jurisdiction of this Court because it regularly transacts business in Kentucky, operates dozens of hotels in Kentucky, contracts to supply services in Kentucky, caused indivisible injuries to the Plaintiff in Kentucky, and knowingly profited from an illegal sex trafficking venture at the Baymont® at 6515 Signature Drive, Louisville, KY 40213.

13.     Upon information and belief, Club NO, Inc. ("Club NO") is a for-profit corporation incorporated in the Commonwealth of Kentucky that can be served with process via its registered

---

[2] Wyndham Hotels and Resorts, 2019 Social Responsibility Report: Protecting Our Human Rights (p.30) available at https://corporate.wyndhamhotels.com/wp-content/uploads/2019/07/Wyndham-GRI-2019-Final_web.pdf (last visited Mar. 25,2021).

agent, Harriet L. Allen, Esq., at 7086 Tates Creek Road, Lexington, KY 40515.

    a. Upon information and belief, the Louisville Manor Adult Hotel located at 4600 Dixie Highway, Louisville, KY 40216 is owned, operated, and/or supervised by Club NO.

    b. As a hotel operator, Club NO controls the training and policies for its hotels including the Louisville Manor Adult Hotel where L.H. was trafficked.

    c. By and through its relationship with the staff at the Louisville Manor Adult Hotel where L.H. was trafficked and the hotel guest perpetrator who trafficked her at the property, Club NO knowingly benefited, or received something of value, from its facilitation of, or participation in, a venture which it knew or should have known to engage in sex trafficking.

    d. Upon information and belief, Club NO receives a percentage of the gross room revenue from the money generated by the operations of the Louisville Manor Adult Hotel, including a percentage of the revenue generated from the rate charged for the rooms in which the Plaintiff was sex trafficked.

    e. Club NO is subject to the jurisdiction of this Court because it is a Kentucky corporation, regularly transacts business in Kentucky, contracts to supply services in Kentucky, caused indivisible injuries to the Plaintiff in Kentucky, and knowingly profited from an illegal sex trafficking venture at the Louisville Manor Adult Hotel at 4600 Dixie Highway in Louisville, KY.

## JURISDICTION AND VENUE

14. This Honorable Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 because this action arises under the Constitution, laws, or treaties of the United States (with an amount in

controversy that exceeds $75,000).

15. Venue is proper in this district pursuant to 28 U.S.C. §1391 because Defendants reside in this district and because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

## SEX TRAFFICKING UNDER FEDERAL LAW

16. Sex trafficking is defined by the TVPRA under 22 U.S.C. §7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion." This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

17. To better understand the mechanism by which sex trafficking is prohibited by federal criminal law, it is best to address these elements in the reverse. Sex trafficking is slavery for the *purpose* of commercial sex, a lens on the already existing crimes prohibited by 18 U.S.C. §§1589 and 1590. The crime of slavery can then be divided into the two (2) elements remaining: the act and the means. The *act* is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. §1590, while the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. §1589.

18. Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. §1591, it is nevertheless a long-recognized and familiar atrocity.

19. Pursuant to 18 U.S.C. §1591(a), all who knowingly provide *or* obtain commercial sex that was provided or obtained through force, fraud, and coercion are guilty of sex trafficking.

This includes, at a minimum, **_both_** the 'traffickers' who recruit, harbor, transport, and provide individuals for forced commercial sex work **_and_** the 'johns' or 'buyers' who obtain, solicit, or patronize forced commercial sex work.[3]

### A. THE HOSPITALITY INDUSTRY PARTICIPATES IN THE SEX TRAFFICKING INDUSTRY

> *"75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation…Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."*
>
> -   *The Polaris Project [4]*

20.     Human trafficking is the world's fastest growing crime.[5] While the term 'human trafficking' incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of **_all_** illegal drugs.[6]

21.     Sex traffickers, or 'pimps,' use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

22.     The hospitality industry plays a crucial role in the sex trade.[7] The trope of the "no-tell, motel" is certainly not a new one. Hotels have long profited from their reputations as havens

---

[3] While the 'pimps' or 'providers' are often referred to as the 'traffickers' and the purchasers are referenced as the 'Johns','tricks', or 'buyers' [and such nomenclature is used herein], under federal law **_both_** categories are 'traffickers.'

[4] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels-recommendations (last visited Mar, 25, 2021).

[5] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.

[6] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014),http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm.

[7] Giovanna L. C. Cavagnaro, Sex Trafficking: The Hospitality Industry's Role and Responsibility, Cornell University School ofHotel Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

of privacy and discretion for the offending. Hotels offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking, in particular.

23.     According to National Human Trafficking Hotline statistics, hotels are the top reported venue, even over commercial front brothels, where sex trafficking acts occur.[8] Traffickers and buyers alike frequently use hotel rooms to exploit victims.

24.     Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. This is referred to as an 'in call.'

25.     Hotels are also the venue of choice for buyers seeking an 'out call,' wherein the buyer rents a hotel room, and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (*i.e.* those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels. In New York City alone, 45% of all reported sexual exploitation took place in hotels, including the Ritz Carlton and the Plaza.[9]

26.     The problem is industry wide. In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[10]

27.     Due to the overall complacency of the hospitality industry on addressing the issue, hotels are *the* venue of choice for sex trafficking.[11] Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce companywide anti-trafficking policies from the

---

[8] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotlinestatistics.

[9] Giovanna L. C. Cavagnaro, *Sex Trafficking: The hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[10] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).

[11] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited Mar, 25, 2021).

corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

28.     Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation. Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur.

29.     But aside from their unique position in this epidemic, hotels and motels have the highest obligation to protect their guests from dangers that were known or should have been known, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[12]

30.     Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal, not to mention moral, obligation for the hospitality industry. The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published over the last decade to help hotel staff in every position to identify the signs.[13]

31.     From check-in to check-out, there are numerous indicators that traffickers and their victims exhibit during their stay at a hotel. With proper training and the implementation of reasonable security measures, hospitality companies could prevent regular sex trafficking under

---

[12] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[13] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

their flag.

32.     Obvious signs of sex trafficking at a hotel may include: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two (2) rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.[14]

33.     Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[15] Thus, hospitality companies are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand standard through to the property level.

34.     Hospitality companies can and should mandate that *all* staff working at *all* hotel properties across their brand complete sex trafficking training.[16]

35.     In 2008, 18 U.S.C. §1595 effectively required all companies with a peculiar proximity to human trafficking to use reasonable measures and conduct proactive audits to ensure that they were not profiting from what they *should know* are human trafficking ventures.

---

[14] Id. See also, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and theirEmployees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[15] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[16] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, TheInstitute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp- content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

36.     The hospitality industry has been cognizant of their role and responsibilities in the sex trafficking industry for years.

37.     In 2011, Wyndham trained only some of its employees to look for signs of trafficking.[17]

38.     In 2012, an anti-trafficking coalition alerted Choice Hotels of the likelihood of sex trafficking during the London Olympics, and inquired about the companies anti-trafficking policies, while urging immediate action regarding trafficking.[18]

39.     Marriott International claims it amended its Human Rights Policy as early as 2006 to reflect growing concerns regarding human trafficking and reviews the policy annually. To date the policy merely states "Marriott supports the elimination of all forms of forced, bonded or compulsory labor and provides associate training on human trafficking awareness and prevention."[19]

40.     In 2013, IHG commissioned an external assessment of human rights risks most relevant for the travel and hospitality sector globally and regionally working with external human rights experts, Maplecroft. The risks identified included human trafficking.[20]

41.     In 2015 and 2016, IHG identified the modern slavery risks most relevant to IHG across four different areas of risk: (i) risks of modern slavery affecting their organization including

---

[17] Katie Lobosco, *Super 8 workers trained to spot sex trafficking*, CNN BUSINESS (Nov. 18, 2014), https://money.cnn.com/2014/11/18/news/companies/days-inn-sex-trafficking/.
[18] *Corporate Strategy to Address Human Trafficking: Investor Recommendations for London Olympic Sponsors and HospitalityCompanies, Christian Brothers Investment Services*, CBIS, http://cbisonline.com/us/wp-content/uploads/sites/2/2012/09/FINAL_OlympicsReport_9_28.pdf (last visited Mar, 25, 2021).
[19] Our Commitment to Human Rights, MARRIOTT INTERNATIONAL INC. available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsCommitment.pdf (last visited Mar, 25, 2021) citing MarriottInternational, Inc.'s Human Rights Policy Statement available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Mar, 25, 2021).
[20] Inter-Continental Hotel Group, Modern Slavery Statement 2017 available at https://www.ihgplc.com/-/media/ihg/Files/pdf/modern-slavery-statement-2017-ihg-010318.ashx?la=en&hash=B688F42E878C145EC5C8C9DF02ABC227 (last visited Mar, 25, 2021).

IHG hotels, (ii) risks of modern slavery occurring in IHG corporate or hotel supply chains, (iii) risks of modern slavery such as human trafficking occurring in or around IHG branded hotels, (iv) risks of modern slavery occurring at different stages of the hotel lifecycle. IHG represents that its various risk assessment mechanisms have helped it to identify higher risk locations since 2013.[21]

42.     In 2016, Starwood Hotels and Resorts, Inc. first updated its 2007 Human Rights Policy to include language and attention specific to sex trafficking.[22]

43.     Choice Hotels has supported the anti-trafficking group Polaris since 2010 and in a partnership with EPCAT (End Child Prostitution, Pornography and Trafficking of Children for Sexual Purposes) developed a training module in 2010 for hotel management and staff.[23]

44.     Further, nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[24] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[25]

45.     Hospitality companies have both the power and responsibility to have sex trafficking difficult for the offenders. Yet, they repeatedly fail to heed the call or repeatedly fail to

---

[21] *Id.*

[22] Promoting Human Rights is Part of Starwood's Strategy, September 21, 2016, HOTEL BUSINESS, https://togo.hotelbusiness.com/article/promoting-human-rights-is-part-of-starwoods-strategy/ (last visited Mar, 25, 2021).

[23] *Human Rights Policy*, CHOICE HOTELS, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Mar, 25, 2021).

[24] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

[25] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited Mar, 25, 2021).

execute their own policies. Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

### B.     THE DEFENDANTS CONTROL THE HOSPITALITY INDUSTRY

46.     Hotel brands or flags lend their name and likeness to third party owners, while the building and operations are run by the franchisee or a third-party management company under the brands' control. In return, the parent brand then gets to exchange the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning only a contract or franchise agreement and still profit from putting heads in beds.

47.     The average consumer does not see this relationship. The parent brand gives the franchisee property its identity. It provides signage on and in front of the building that assures customers that if they check into that hotel, they can expect the standards consistent with the parent hotel brand. The same brand that is emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

48.     In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS), and other online travel agency databases, the brand provides the local hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs, and a website. Thus, booking and room reservations are controlled by the corporate parent brand.[26]

49.     The franchise hotel typically pays around 10% of their total revenue back to the parent hotel brand and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

50.     Per the franchise agreement, the parent brand may enforce these standards through

---

[26] Ellen Meyer, The Origins and Growth of Franchising in the Hotel Industry, Lodging Magazine (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/

periodic inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate. The right of the parent hotel brand to enforce their brand standards is also their responsibility.

51.     At the time of the incidents alleged herein:

a.     Defendant RRI owned and controlled the Red Roof Inn® brand.

b.     Defendant Wyndham Hotels and Resorts, Inc., owned and controlled the Baymont® brand.

c.     Defendant Club NO owned and controlled the Louisville Manor Adult Hotel.

52.     Parent hotel brands may kick delinquent hotels out of their system, but it is at the expense of terminating their royalty payments, so it is seldom done.

### C.     DEFENDANTS' WILLFUL BLINDNESS TO SEX TRAFFICKING AT THEIR HOTEL PROPERTIES

53.     Defendants RRI, Wyndham, and Club NO have been on notice of repeated incidences of sex trafficking occurring at their hotels yet failed to take the necessary action to prevent sex trafficking and still persist in failing to take the necessary action to prevent sex trafficking at their hotels.

54.     RED ROOF INN, INC. ("RRI")

a.     Defendant RRI owns, supervises, and/or operates the Red Roof Inn located at 3322 Red Roof Inn Place in Louisville, KY.

b.     Defendant RRI owns, supervises, and/or operates the Red Roof Inn located at 4704 Preston Highway in Louisville, KY.

c.     RRI failed to implement and enforce any of its own policy or policies and protect Plaintiff L.H. from being sex trafficked.

d.      Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant RRI has repeatedly failed to stop these actions.

e.      Defendant RRI may exercise control over the Red Roof Inn® hotel properties by:

i.    distributing information to assist employees in identifying human trafficking;

ii.   providing a process for escalating human trafficking concerns within the organization;

iii.  requiring employees to attend training related to human trafficking;

iv.   providing new hire orientation on human rights and corporate responsibility;

v.    providing training and education to Comfort Inn & Suites® hotels through webinars, seminars, conferences, and online portals;

vi.   developing and holding ongoing training sessions on human trafficking; or

vii.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

f.   RRI was in an actual or apparent agency relationship with Red Roof Inn® hotels offering public lodging services in the hotel. This agency relationship was created through Defendant RRI's exercise of an ongoing and systemic right of control over Red Roof Inn® hotels by Defendant RRI's operations, including the means and methods of how Red Roof Inn® hotels conducted daily business through one or more of the following actions:

    i.   hosting online bookings on Defendant RRI's domain;

    ii.   requiring Red Roof Inn® hotels to use RRI's loyalty program;

    iii.   setting employee wages;

    iv.   making employment decisions;

    v.   advertising for employment;

    vi.   sharing profits;

    vii.   standardized training methods for employees;

    viii.   building and maintaining the facility in a manner specified by the owner;

    ix.   standardized or strict rules of operation;

    x.   regular inspection of the facility and operation by the owner;

    xi.   fixing prices; or

    xii.   Other actions that deprive Red Roof Inn® hotels of independence in business operations.

g.   An actual and/or apparent agency also exists between Defendant RRI and Red Roof Inn® by RRI. Defendant RRI holds out Red Roof Inn® hotels to the public as possessing authority to act on its behalf.

h.   Given the control Defendant RRI assumed in educating, implementing, and directing its hotels, including Red Roof Inn® hotels, Defendant RRI breached its duties in the following ways:

    i.   Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

    ii.   Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

    iii.   Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

    iv.   Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

    v.   Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

    vi.   Failed (altogether or inadequately) to monitor usage of hotel Wi-Fi;

    vii.   Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

    viii.   Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

i.   For years, Defendant RRI has failed to address the rampant culture of sex trafficking which tragically occurs throughout its Red Roof Inn® hotels across the country. Defendant RRI has demonstrated deeply entrenched apathy to the real risk of sex trafficking and pervasive willful blindness to the role its Red Roof Inn® hotels play in sex trafficking. This entrenched, willful blindness facilitated the sex trafficking of Plaintiff L.H. at a Red Roof Inn® hotels that forms the basis of this Complaint.

j.   It is averred that Defendant RRI is aware of the sex trafficking that occurs throughout its brand hotels by way of monitoring crime on its properties posted and publicly available on various news websites.

    i.   In April 2014, a man was arrested for engaging in prostitution at the Red

Roof Inn on Blairwood Road, further investigation reviled that multiple young women were forced to engage in commercial sex. [27]

ii. In September 2015, men were arrested in a sex-with-minors sting at the Red Roof Inn® in Woodbury, KY. Police took out two ads, resulting in eight arrests. A similar sting in 2014 resulted in seven men being charged for agreeing to hire a 14-year-old to engage in sexual conduct.[28]

iii. In May 2016, two people were arrested at the Red Roof Inn® located at 9330 Blairwood Road after an undercover detective responded to a backpage.com ad and a young juvenile female was brought to the hotel to preform sexual activities with the undercover officer.[29]

iv. In November 2016, a man was arrested at the Red Roof Inn® located at 4704 Preston Highway in Louisville after he strangled Thomas Joseph Grismer to death and placed another man in a choke hold until police intervened.[30]

v. In December 2016, three people were arrested during an undercover investigation into prostitution and sex trafficking. A detective arranged to meet two women at a Red Roof Inn® location in Louisville, KY where they were arrested for agreeing to engage in sexual activity and a male seen leaving the hotel during the undercover investigation was arrested for

---

[27] https://www.justice.gov/usao-wdky/pr/cincinnati-ohio-man-pleads-guilty-sex-trafficking
[28] https://www.republicaneagle.com/news/public_safety/update-police-arrest-15-men-in-sex-with-minors-sting-at-red-roof-inn/article_e48299f7-e13d-5c86-8e9f-f7faf22a8998.html
[29] https://www.wave3.com/story/31910401/2-charged-with-human-trafficking-involving-juvenile/
[30] https://www.wave3.com/story/30537135/man-charged-with-murder-in-red-roof-inn-choking-death/

promoting prostitution.[31]

      vi.  In 2022, RRI adopted the ECPAT-USA's Tourism Childhood- Protection Code of Conduct, and in so doing, stated that RRI "encourages all of our partners and peers in travel and hospitality to join us and stand by ECPAT-USA in the fight against human trafficking.".[32] RRI was several years behind the other major hotel brands in this regard.

k.  It is believed, and therefore averred, that at the time of Plaintiff's trafficking, Defendant RRI's corporate policies regarding trafficking integrated ongoing education in many formants to teach franchisee management and staff to identify signs of sex trafficking.

l.  It is believed, and therefore averred, that at the time of Plaintiff's trafficking, Defendant RRI's corporate policies required franchisee management and staff to report signs of sex trafficking at the franchisee location to Defendants.

m.  It is believed, and therefore averred, that at the time of Plaintiff's trafficking, Defendant RRI received and regularly monitors these reports.

n.  Through such review and monitoring, Defendant RRI has been aware of sex trafficking occurring at Red Roof Inn® hotels across its brand and specifically aware of the sex trafficking of L.H. at the Red Roof Inn® hotels that forms the basis of this Complaint.

55.    WYNDHAM HOTELS AND RESORTS, INC. ("WYNDHAM")

---

[31] https://www.wdrb.com/news/crime-reports/louisville-police-arrest-three-during-undercover-prostitution-investigation/article_12b5448c-2857-5b6b-ba04-0aba80d5b5da.html
[32] https://www.wdrb.com/news/crime-reports/louisville-police-arrest-three-during-undercover-prostitution-investigation/article_12b5448c-2857-5b6b-ba04-0aba80d5b5da.html

a. Defendant Wyndham owns, supervises, and/or operates the Baymont® Hotel at 6515 Signature Drive, Louisville, KY 40213.

b. Wyndham failed to implement and enforce any of its own policy or policies and protect Plaintiff L.H. from being sex trafficked.

c. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Wyndham has repeatedly failed to stop these actions.

d. Defendant Wyndham may exercise control over Baymont® hotels by:

    i. distributing information to assist employees in identifying human trafficking;

    ii. providing a process for escalating human trafficking concerns within the organization;

    iii. requiring employees to attend training related to human trafficking;

    iv. providing new hire orientation on human rights and corporate responsibility;

    v. providing training and education to Baymont® hotels through webinars, seminars, conferences, and online portals;

    vi. developing and holding ongoing training sessions on human trafficking; or

    vii. providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

e. Wyndham was in an actual or apparent agency relationship with Baymont® hotels offering public lodging services in the hotel. This agency relationship was created through Defendant Wyndham's exercise of an ongoing and systemic right of control

over Baymont® hotels by Defendant Wyndham's operations, including the means and methods of how Baymont® hotels conduct daily business through one or more of the following actions:

  i. hosting online bookings on Defendant Wyndham's domain;

  ii. requiring Baymont® hotels to use Defendant Wyndham's customer rewards program;

  iii. setting employee wages;

  iv. making employment decisions;

  v. advertising for employment;

  vi. sharing profits;

  vii. standardized training methods for employees;

  viii. building and maintaining the facility in a manner specified by the owner;

  ix. standardized or strict rules of operation;

  x. regular inspection of the facility and operation by owner;

  xi. fixing prices; or

  xii. other actions that deprive Baymont® hotels of independence in business operations.

f. An actual and/or apparent agency also exists between Defendant Wyndham and Baymont® hotels. Defendant Wyndham holds out Baymont® hotels to the public as possessing authority to act on its behalf.

g. Given Defendant Wyndham's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its hotels, including Baymont® hotels, Defendant Wyndham breached its duties in the following ways:

i.   Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

ii.  Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

iii. Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

iv.  Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

v.   Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

vi.  Failed (altogether or inadequately) to monitor usage of hotel Wi-Fi;

vii. Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

viii. Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

h.  For years, Defendant Wyndham has failed to address the rampant culture of sex trafficking which tragically occurs throughout its Baymont® hotels across the country. Defendant Wyndham has demonstrated deeply entrenched apathy to the real risk of sex trafficking and pervasive willful blindness to the role its Baymont® hotels play in sex trafficking. This entrenched, pervasive willful blindness facilitated the sex trafficking of Plaintiff L.H. at a Baymont® hotel that forms the basis of this

Complaint.

i. It is averred that Defendant Wyndham is aware of the sex trafficking that occurs throughout its brand hotels by way of regularly monitoring customer reviews of its properties posted and publicly available on various online review websites as well as notifications of crime on its properties posted and publicly available on various news websites.

    i. In June 2013, police discovered several women acting as prostitutes at the Baymont® Hotel on Signature Drive during a narcotics investigation. When Police went to room 205, they found heroin and drug paraphernalia along with a man inside who charged with trafficking heroin, possession of heroin, possession of paraphernalia and complicity to prostitution.  Police also witnessed a convicted felon throwing a semi-automatic handgun out the window of room 202 nearby.[33]

    ii. In February 2016, sixteen men were arrested during an undercover human trafficking and prostitution investigation and a missing minor was located. Two suspects were arrested and faced human trafficking charges at the Days Inn® on Fern Valley Road and on Blairwood Road in Louisville.[34]

       1. Days Inn® is a Wyndham property.

    iii. In February 2022, The Louisville Metro Council Voted to approve an ordinance to ban hourly hotel rentals. Louisville Metro Police Maj. Corey

---

[33] https://www.wdrb.com/news/report-louisville-police-find-several-prostitutes-at-baymont-inn/article_83db6879-b7a9-5b11-b60e-518fde49b3cf.html
[34] https://www.wdrb.com/news/crime-reports/police-say-they-found-missing-teen----and-made-16-arrests--/article_85083234-32c2-52b2-b286-a34cf1286eaa.html

Robinson told committee members that between January 2020 and January 2021, his officers responded to 5,001 calls, and 30% of those calls were to the Red Roof Inn at 4704 Preston Highway, Super 8 at 4800 Preston Highway, Red Roof Inn at 3322 Red Roof Inn Place and Budget Inn and Suites at 3304 Bardstown Road. [35]

56.     CLUB NO, INC. ("CLUB NO")

a. Defendant Club NO owns, supervises, and/or operates the Louisville Manor Adult Hotel at 4600 Dixie Highway in Louisville, KY.

b. Club NO failed to implement and enforce any of its own policy or policies and protect Plaintiff L.H. from being sex trafficked.

c. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at hotels, Defendant Club NO failed to stop these actions.

d. Defendant Club NO may exercise control over the Louisville Manor Adult Hotel by:

i. distributing information to assist employees in identifying human trafficking;

ii. providing a process for escalating human trafficking concerns within the organization;

iii. requiring employees to attend training related to human trafficking;

iv. providing new hire orientation on human rights and corporate responsibility;

v. providing training and education to Baymont® hotels through webinars,

---

[35] https://www.courier-journal.com/story/news/politics/metro-government/2022/02/12/louisville-ordinance-would-ban-hourly-under-12-hour-hotel-room-rentals/6755357001

seminars, conferences, and online portals;

vi.  developing and holding ongoing training sessions on human trafficking; or

vii.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

e.  Upon information and belief, Club NO was in an actual or apparent agency relationship with the Louisville Adult Manor Hotel offering public lodging services in the hotel. This agency relationship was created through Defendant Club NO's exercise of an ongoing and systemic right of control over the Louisville Manor Adult Hotel's operations, including the means and methods of how the hotel conducts daily business through one or more of the following actions:

i.  setting employee wages;

ii.  making employment decisions;

iii.  advertising for employment;

iv.  sharing profits;

v.  standardized training methods for employees;

vi.  building and maintaining the facility in a manner specified by the owner;

vii.  standardized or strict rules of operation;

viii.  regular inspection of the facility and operation by owner;

ix.  fixing prices; or

x.  other actions that deprive the Louisville Manor Adult Hotel of independence in business operations.

f.  An actual and/or apparent agency also exists between Defendant Club NO and the

Louisville Manor Adult Hotel by way of the fact that Defendant Club NO holds out the Louisville Manor Adult Hotel to the public as possessing authority to act on its behalf.

g. Defendant Club NO breached its duty of care to Plaintiff and was negligent in the following ways:

    i. Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

    ii. Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

    iii. Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

    iv. Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

    v. Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

    vi. Failed (altogether or inadequately) to monitor usage of hotel Wi-Fi;

    vii. Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

    viii. Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

### D.    THE SEX TRAFFICKING OF L.H.

57.     The facts alleged herein stem from a human trafficking and prostitution venture operated in the Lexington, Kentucky area. While victimized by her trafficker, L.H. was subject to repeated instances of physical abuse, rape, exploitation, psychological torment, kidnapping and imprisonment, and false imprisonment at Defendants' hotels from approximately early January to early February 2018.

58.     In approximately January 2018, Plaintiff was 16 years old and ran away from a group home at which she was residing at the time.

59.     After running away and having been walking for quite some time, Plaintiff sat down to take a break, at which time she was approached adult male who identified himself as "Q," who struck up a conversation with Plaintiff and advised that he had somewhere warm they could go.

60.     Q would later be identified as Quentin J. Burris.

61.     Given the cold temperatures and that Plaintiff had nowhere else to go, she accepted Mr. Burris' offer.

62.     Mr. Burris' then transported Plaintiff back to his house, at which time he furnished marijuana and alcohol to Plaintiff.

63.     Mr. Burris then advised that he wanted to take Plaintiff to his "homegirl's" house, emphasizing that she "knew how to make money," and proceeded to take Plaintiff to Ms. Varney's home.

64.     After arrival, Ms. Varney informed Plaintiff that she could make money, but would first need to pose naked for photographs.

65.     Ms. Varney took the photographs and, upon information and belief, posted them to Backpage.com., a website formerly known for sex trafficking and other illicit purposes before being seized and shut down by federal authorities in mid-2018.

### i.   L.H's Sex Trafficking at Red Roof Inn® Properties

66.     Ms. Varney then introduced Plaintiff to another associate, Nigel Nicholas, at a Red Roof Inn® located, to the best of Plaintiff's ability to recall, at 4704 Preston Highway in Lexington.

67.     Mr. Nicholas stated to Plaintiff that before he would "invest" in her, Plaintiff would have to "show [Nicholas] what she could do."

68.     Plaintiff was then forced to have sex with numerous commercial sex buyers at the Red Roof Inn® that night.

69.     Mr. Burris arrived later that evening, and it is averred that all three traffickers shared in a financial gain as a result of the sex trafficking activity at the Red Roof Inn®.

70.     Upon information and belief, Plaintiff was kept at this Red Roof Inn® property for a period of a few days.

71.     During that time, Plaintiff overheard Mr. Nicholas and Ms. Varney discussing money, and it is believed that Mr. Nicholas may have paid for Plaintiff's accommodations with a credit card.

72.      During the time she was at the first Red Roof Inn® property, Plaintiff was forced to engage in commercial sex with at least ten to 12 johns per day, creating a clear and unusually high volume of foot traffic into and out of her room.

73.     While staying at the Red Roof Inn®, Ms. Varney did not have cellular service, so she utilized the hotel's Wi-Fi connection continue uploading pictures of Plaintiff and advertisements for commercial sex to Backpage.com and escorts.com.

74.     After a few days, Ms. Varney expressed to Plaintiff that the Red Roof Inn® property was becoming "too hot," meaning she felt that they were starting to arouse suspicion due

to noise complaints and the smell of cigarette and marijuana smoke, so they left the Red Roof Inn®
to go to the Louisville Manor Adult Motel.

### ii. LH's Trafficking at the Louisville Manor Adult Hotel

75.     After leaving the first Red Roof Inn® property, Plaintiff was taken to the Louisville
Manor Adult Hotel, located at 4600 Dixie Highway in Shively, KY.

76.     It is averred that the Louisville Manor Adult Hotel is notorious among the
community for prostitution and commercial sex activity.

77.     Upon information and belief, the Louisville Manor Adult Hotel offered rooms that
could be purchased by the hour.

78.     Upon information and belief, either Ms. Varney or Mr. Nicholas may have paid for
the room in cash.

79.     During the few hours she was at the Louisville Manor Adult Hotel, she was forced
to service approximately five or six johns in her room.

80.     At one point, Ms. Varney went to the front desk to book a room for an extra hour,
as she herself was engaged in commercial sex and needed the room for an appointment with a
different john.

81.     While at the Louisville Manor Adult Hotel, Plaintiff expressed to Ms. Varney that
she wanted to leave the hotel because she did not want to continue to be forced to service
commercial sex buyers.

82.     Ms. Varney responded by physically blocking the door with her body and getting
into a loud, profane shouting argument with Plaintiff.

83.     Soon after this loud and conspicuous verbal altercation, a staff member approached
the room and spoke with Ms. Varney to let her know that there was a noise complaint, and that

they would have to "keep it down or leave."

84.     During the time Plaintiff was kept at the Louisville Manor Adult Hotel, Ms. Varney used the hotel Wi-Fi to continue uploading pictures and advertisements to Backpage.com and escorts.com.

85.     Eventually, while Ms. Varney was engaged in commercial sex with a john, a male hotel staff member informed them that they were making too much noise and would have to leave.

### iii. L.H.'s Sex Trafficking at the Baymont® Hotel

86.     After being kicked out of the Louisville Manor Adult Hotel, Plaintiff was taken back to a residential property Ms. Varney had been renting from Mr. Nicholas, where she was again trafficked for commercial sex by Ms. Varney and Mr. Nicholas.

87.     Plaintiff was taken to Goodwill to shop for new clothes, so as to increase her appeal to commercial sex buyers in the advertisements her traffickers were posting online.

88.     Ms. Varney and Mr. Nicholas then took Plaintiff to the Baymont® Hotel located at 6515 Signature Dr, Louisville, KY 40213.

89.     It is believed that Mr. Nicholas paid for one night's stay with a credit card.

90.     Ms. Varney and Mr. Nicholas then took Plaintiff up to their room to take and upload more photographs and advertisements to Backpage.com and escorts.com, using the hotel Wi-Fi connection.

91.     At this time, Plaintiff again expressed a desire to leave, at which time Ms. Varney again physically blocked Plaintiff's exit and became loud and confrontational with her.

92.     A short time later, a hotel employee described as a balding, white male with a brown beard came to the room, indicating that he had received a complaint about the smell of cigarette and marijuana smoke and that they would have to leave if another such complaint were received.

93.     Plaintiff was kept at the hotel property for approximately a five-hour period.

94.     During that time, she was forced to provide commercial sex to three or four johns.

95.     While Plaintiff was being trafficked, other persons entered the room and smoked marijuana while engaging Ms. Varney in conversation.

96.     About 20 minutes later, the same hotel staff member who had previously advised them of the noise complaint returned and asked them to leave due to complaints about the odor of marijuana use.

### iv. L.H.'s Sex Trafficking at a Second Red Roof Inn® Property

97.     Following her stay at the Baymont® Hotel, Plaintiff was taken to a second Red Roof Inn® property, this one located at 3322 Red Roof Inn Place in Louisville, where her a room was paid for by unknown payment method.

98.     Plaintiff noted that strewn throughout the property were used condoms, tourniquets, and syringes, indicative of high amounts of illicit drug and commercial sex activity.

99.     At check-in, towels were pre-ordered for the room, such that hotel housekeeping staff would not need to enter the room.

100.    Soon after checking in, Plaintiff's trafficker posted pictures of Plaintiff on Backpage.com and escorts.com using the hotel Wi-Fi and advertised her for commercial sex.

101.    Plaintiff was kept at this hotel property for approximately two or three days, during which time she was forced to perform commercial sex acts with approximately 30 johns, all of whom had to pass through the lobby and front desk, as well as numerous hotel rooms, in order to access Plaintiff's room located at the back of the hotel.

102.    Plaintiff was tasked with collecting the payment from the johns and then giving all the money to her trafficker by placing it in the hotel nightstand for them to retrieve.

103.    Plaintiff was not permitted to keep, nor was ever given any of the funds collected in this venture.

104.    On one occasion, a john stole his money back while Plaintiff was getting dressed and left without paying, causing her trafficker to become enraged and berate Plaintiff in a loud, profane fashion.

105.    On another occasion, a female housekeeping worker was permitted to enter the room and observed Plaintiff looking pale and sick, prompting her to look at Plaintiff curiously, but the housekeeping worker did not inquire as to Plaintiff's wellbeing, nor, upon information and belief, did she make any type of report to anyone regarding Plaintiff's condition or activity.

106.    After a few days, her trafficker(s) stated that the hotel was getting "hot," and took Plaintiff to a few private residences and an unknown hotel in Indiana, during which time she was sexually assaulted by one of her trafficker's friends.

107.    Meanwhile, Plaintiff's physical condition continued to worsen.

108.    One day, Plaintiff awoke to hotel staff knocking on her door, telling her she had to leave because the rest of her party had checked out.

109.    After Plaintiff could not reach anyone via phone and was experiencing difficulty maintaining consciousness, Plaintiff called 911 and disclosed that she was a sex trafficking victim in need of help.

110.    Plaintiff was transported by EMS to an unknown hospital in Indiana, at which time she was treated for sepsis and dehydration, and for chemical dependency relating to her use of marijuana and crack cocaine furnished to her by her traffickers, who used the common sex trafficker tactic of fostering chemical dependency within their victims as a means of establishing control and compliance.

111.    Police arrived within 5-10 minutes of Plaintiff's arrival at the hospital, but she was too sick and weak to give an interview at that time.

112.    Plaintiff was subsequently transferred to another unknown hospital in Kentucky, where her condition improved enough for her to give a statement to law enforcement.

113.    By April 2018, Quentin Burris, Nigel Nicholas, and Abigail Varney were arrested and charged with, *inter alia*, sexual abuse and sex trafficking of minors.

114.    In November 2021, Burris, Nicholas, and Varney were each sentenced to five years in prison for their crimes.

### E.  DEFENDANTS FACILITATED THE SEX TRAFFICKING OF L.H.

115.    Defendants RRI, Wyndham, and Club NO profited from the sex trafficking of L.H. and knowingly or negligently aided and engaged with her traffickers in his sex trafficking venture. The Defendants leased rooms to L.H.'s traffickers for hours to days at a time, when they knew, or should have known, that they were using the hotel room to imprison L.H. and subject her to repeated exploitation by forcing her into sexual servitude.

116.    Defendants RRI, Wyndham, and Club NO knew, or should have known, that L.H. was being trafficked and that the Defendants were knowingly benefiting financially from said exploitation.

117.    Defendants RRI, Wyndham, and Club NO knew, or should have known, that L.H. was being trafficked because L.H.'s traffickers paid for her room using cash, refused housekeeping services and/or requested services to dispose of trash filled with condoms, frequently requested extra towels and sheets, constantly entertained an absurd amount of foot traffic from male visitors every day, and checked in with an underage girl; behavior that indicated that Defendants' hotels were being used for an illegal sex trafficking venture.

118.   Defendants RRI, Wyndham, and Club NO actively participated in this illegal endeavor by knowingly providing lodging to L.H.'s traffickers in which to harbor L.H. while she was being trafficked.

119.   Defendants RRI, Wyndham, and Club NO profited from the sex trafficking of L.H. and knowingly aided and participated with L.H.'s trafficker in his criminal venture. The Defendants took no preventative action in response to the constant foot traffic from male visitors, loud altercations, drug use and other unlawful activity, and clear signs of neglect and abuse occurring and existing in full view of hotel staff.

120.   All defendants had every opportunity to stop L.H.'s trafficking and prevent them from trafficking L.H. and others.

121.   Instead, all defendants failed to take any reasonable measures whatsoever to stop sex trafficking from occurring inside the walls of their hotel properties.

122.   All defendants financially benefited from the sex trafficking of L.H. and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

123.   All defendants enjoy the steady stream of income that sex traffickers bring to their hotel properties.

124.   All defendants financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

125.   All defendants failed to take any steps to alert the authorities, properly intervene in the situation, or undertake reasonable security measures so as to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties.

126.   The defendants maintained their deficiencies to maximize profits by:

    a.  Reducing the cost of training employees and managers of how to spot the signs of human trafficking and sexual exploitation and what steps to take;

    b.  Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

    c.  Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation.

127.   As a direct and proximate result of these egregious practices on the part of all defendants, L.H. has been permanently injured and damaged physically, emotionally, psychologically, and financially.

## CAUSES OF ACTION
### COUNT ONE – 18 U.S.C §1595 ("TVPRA")
### L.H. v. RED ROOF INN, INC.

128.   Plaintiff L.H. incorporates each foregoing allegation as if set forth in full herein.

129.   L.H. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

130.   Defendant RRI's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, Defendant RRI had a statutory obligation not to benefit financially from a venture that it knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a). At all relevant times, Defendant RRI breached this duty by participating in, and facilitating, the harboring and providing of L.H. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and/or commissions.

131.     Defendant RRI has financially benefited from these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of its customer base that seeks to participate in the sex trade. Moreover, Defendant RRI directly benefitted from the trafficking of L.H. on each occasion it received payment for rooms in which she was kept at the Defendant's hotel. The actions, omissions, and/or commissions alleged in this pleading were the but for and proximate cause of L.H.'s injuries and damages.

132.     L.H. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendant RRI's hotel and property in violation of 18 U.S.C. §1591(a).

### COUNT TWO – 18 U.S.C §1595 ("TVPRA")
### L.H. v. WYNDHAM HOTELS AND RESORTS, INC.

133.     Plaintiff L.H. incorporates each foregoing allegation as if set forth in full herein.

134.     L.H. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

135.     Defendant Wyndham's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, Defendant Wyndham had a statutory obligation not to benefit financially from a venture that it knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a). At all relevant times, Defendant Wyndham breached this duty by participating in, and facilitating, the harboring and providing of L.H. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and/or commissions.

136.     Defendant Wyndham has financially benefited from these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of its customer base that seeks to participate in the sex trade. Moreover, Defendant Wyndham directly

benefitted from the trafficking of L.H. on each occasion it received payment for rooms in which she was kept at the Defendant's hotel. The actions, omissions, and/or commissions alleged in this pleading were the but for and proximate cause of L.H.'s injuries and damages.

137.    L.H. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendant Wyndham's hotel and property in violation of 18 U.S.C. §1591(a).

### COUNT THREE – 18 U.S.C §1595 ("TVPRA")
### L.H. v. CLUB NO, INC.

138.    Plaintiff L.H. incorporates each foregoing allegation as if set forth in full herein.

139.    L.H. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

140.    Defendant Club NO's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, Defendant Club NO had a statutory obligation not to benefit financially from a venture that it knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a). At all relevant times, Defendant Club NO breached this duty by participating in, and facilitating, the harboring and providing of L.H. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and/or commissions.

141.    Defendant Club NO has financially benefited from these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of its customer base that seeks to participate in the sex trade. Moreover, Defendant Club NO directly benefitted from the trafficking of L.H. on each occasion it received payment for rooms in which she was kept at the Defendant's hotel. The actions, omissions, and/or commissions alleged in this pleading were the but for and proximate cause of L.H.'s injuries and damages.

142.    L.H. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendant Club NO's hotel and property in violation of 18 U.S.C. §1591(a).

## **PRAYER FOR RELIEF**

**WHEREFORE,** on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendants, and that the jury selected award damages to the Plaintiff in an amount which will effectively prevent other similarly caused acts and adequately reflects the enormity of the Defendants' wrongs and injuries to the Plaintiff due to the Defendants' faulty conduct, including but not limited to:

a.   All available compensatory damages for the described losses with respect to each cause of action;

b.   past and future medical expenses, as well as the costs associated with past and future life care;

c.   past and future lost wages and loss of earning capacity;

d.   past and future emotional distress;

e.   consequential and/or special damages;

f.   all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

g.   punitive damages with respect to each cause of action;

h.   reasonable and recoverable attorneys' fees;

i.   costs of this action; and

j.   pre-judgment and all other interest recoverable.

Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

### THE PLAINTIFF DEMANDS A TRIAL BY JURY

**RESPECTFULLY** submitted this 28th day of November, 2022.

**RESPECTFULLY SUBMITTED,**

*/s/ Lauren Marley*
Lauren Marley, Esq.
Morgan & Morgan
360 E. 8th Avenue, Suite 411
Bowling Green, KY 42101
Telephone: (270) 495-6798
Facsimile: (270) 495-6839
lmarley@forthepeople.com
*Counsel for Plaintiff*