UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

L.H., AN INDIVIDUAL,      )
          )
    Plaintiff,      )    Civil Action No. 3:22-CV-625-CHB
          )
v.          )
          )    **MEMORANDUM OPINION**
RED ROOF INN, INC., *et al.*,    )    **AND ORDER**
          )
    Defendants.    )

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Defendant Red Roof Inn, Inc.'s Motion to Dismiss Plaintiff's Complaint [R. 14] and Defendant Wyndham Hotels and Resorts, Inc.'s Motion to Dismiss Plaintiff's Complaint [R. 20].[1]  Both motions are fully briefed.  *See* [R. 19; R. 27; R. 28; R. 32].  For the following reasons, Red Roof's Motion [R. 14] will be **GRANTED** in part and **DENIED** in part, and Wyndham's Motion [R. 20] will be **GRANTED**.

## I.    Background

Plaintiff L.H. filed her Complaint in this action on November 28, 2022.  [R. 1].  The Complaint describes L.H. as "a survivor of sex trafficking under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter 'TVPRA')."  *See id.* at 2 ¶ 3.  She has named Red Roof, Wyndham, and Club NO, Inc., as Defendants and alleges that she was abused at these hotels' properties from January 2018 to February 2018.  *See id.* at 1, 3-6.  Through her Complaint, L.H. seeks to hold the Defendant hotels liable for "ignor[ing] the open

---

[1] Defendant Red Roof Inn is, at times, referred to as Red Roof Inn**s** in the record.  *See* [R. 14, p. 1].  The Court will refer to this Defendant simply as "Red Roof" and will refer to Defendant Wyndham Hotels and Resorts as "Wyndham."

and obvious presence of sex trafficking on their properties, [and] enjoying the profit from rooms rented for this explicit and apparent purpose" in violation of the TVPRA. *See id.* at 1 ¶ 2.

By way of background, the Complaint alleges that, in approximately January 2018, L.H. was 16 years old and that she ran away from a group home at which she was residing. *Id.* at 28 ¶ 58. After running away and walking for quite some time, L.H. sat down to take a break, at which time she was approached by an adult male who identified himself as "Q." *Id.* at ¶ 59. Q would later be identified as Quentin J. Burris. *Id.* at ¶ 60. Burris struck up a conversation with L.H. and advised that he had somewhere warm they could go. *Id.* at ¶ 59. Given the cold temperatures and because L.H. had nowhere else to go, she accepted Burris's offer. *Id.* at ¶ 61.

Burris transported L.H. back to his house, where he furnished her with marijuana and alcohol. *Id.* at ¶ 62. He then advised her that he wanted to take L.H. to his "homegirl's" house, emphasizing that she "knew how to make money." *Id.* at ¶ 63. Burris took L.H. to Abigail Varney's home. *Id.* at 28 ¶ 63, 34 ¶ 113. Varney told L.H. she could make money, but that L.H. would first need to pose naked for photographs. *Id.* at 28 ¶ 64. Varney took the photographs and then posted them to Backpage.com, "a website formerly known for sex trafficking and other illicit purposes before being seized and shut down by federal authorities in mid-2018." *Id.* at ¶ 65.

Varney introduced L.H. to another associate, Nigel Nicholas, at a Red Roof property, which, to the best of L.H.'s recollection, was located at 4704 Preston Highway.[2] *Id.* at 29 ¶ 66. Nicholas told L.H. that before he would "invest" in her, L.H. would have to "show [Nicholas] what she could do." *Id.* at ¶ 67. L.H. was then forced to have sex with numerous commercial sex buyers at the Red Roof property that night. *Id.* at ¶ 68. Burris arrived later that evening, and L.H. alleges

---

[2] The Complaint describes this property as being located in Louisville *and* Lexington. *Compare* [R. 1, p. 15 ¶ 54(b)] *with* [R. 1, p. 29 ¶ 66]. It appears the reference to Lexington was a scrivener's error.

that he, Varney, and Nicholas shared financial gain as a result of the sex trafficking activity at that Red Roof property. *Id.* at ¶ 69.

L.H. was kept at that Red Roof property for several days. *Id.* at ¶ 70. During that time, she heard Nicholas and Varney discussing money and believes Nicholas may have paid for L.H.'s accommodations with a credit card. *Id.* at ¶ 71. While she was at this Red Roof property, L.H. was forced to engage in commercial sex with a least ten to twelve johns per day, which she alleges "creat[ed] a clear and unusually high volume of foot traffic into and out of her room."[3] *Id.* at ¶ 72. Varney did not have cellular service at this property, so she used the hotel's Wi-Fi connection to continue uploading pictures of L.H. and advertisements for commercial sex to Backpage.com and escorts.com. *Id.* at ¶ 73.

After a few days, Varney expressed to L.H. that the Red Roof property was becoming "too hot," meaning Varney felt they were starting to arouse suspicion due to noise complaints and the smell of cigarette and marijuana smoke. *Id.* at 29-30 ¶ 74. Thus, the individuals left the Red Roof property to go to the Louisville Manor Adult Hotel (a Club NO property) located at 4600 Dixie Highway in Shively, Kentucky.[4] *Id.* at 25 ¶ 56(a), 30 ¶ 75. L.H. alleges that "the Louisville Manor Adult Hotel is notorious among the community for prostitution and commercial sex activity" and that the hotel offered rooms that could be purchased by the hour. *Id.* at 30 ¶ 76. Either Varney or Nicholas may have paid for the room in cash. *Id.* at ¶ 77. L.H. was at the Louisville Manor Adult Hotel for only a few hours, but during that time, she was forced to service approximately five or six johns in her room. *Id.* at ¶ 79. At one point, Varney went to the front desk to book a room for

---

[3] As used in the Complaint, "johns" refer to "'buyers' who obtain, solicit, or patronize forced commercial sex work." *See* [R. 1, p. 8 ¶ 19].

[4] The Complaint once names this establishment as a "motel," but then uses "hotel" on subsequent references. *Compare* [R. 1, p. 30 ¶ 74] *with* [R. 1, p. 30 ¶ 75]. The Court will use the word "hotel" as that is what L.H. predominately calls this property.

an extra hour because she herself was engaged in commercial sex and needed the room for an appointment with a different john. *Id.* at ¶ 80.

    While L.H. was at the Louisville Manor Adult Hotel, she expressed to Varney that she wanted to leave the hotel because she did not want to continue to be forced to service commercial sex buyers. *Id.* at ¶ 81. Varney responded by physically blocking the door with her body and getting into a loud, profane shouting argument with L.H. *Id.* at ¶ 82. Soon after this loud and conspicuous altercation, a hotel staff member approached the room and spoke with Varney to let her know about a noise complaint and that they would have to "keep it down or leave." *Id.* at 30 -31 ¶ 83 .

    During the hours L.H. was kept at the Louisville Manor Adult Hotel, Varney used the hotel's Wi-Fi to continue uploading pictures and advertisements to Backpage.com and escorts.com. *Id.* at 31 ¶ 84. Eventually, while Varney was engaged in commercial sex with a john, a hotel staff member informed them that they were making too much noise and would have to leave. *Id.* at ¶ 85. After being kicked out of the Louisville Manor Adult Hotel, L.H. was taken to a residential property Varney had been renting from Nicholas. *Id.* at ¶ 86. At this property, L.H. was again trafficked for commercial sex by Varney and Nicholas. *Id.* She was also taken to Goodwill to shop for new clothes to increase her appeal to commercial sex buyers in the advertisements her traffickers were posting online. *Id.* at ¶ 87.

    Varney and Nicholas then took L.H. to a Baymont Hotel (a Wyndham property) located at 6515 Signature Drive in Louisville. *Id.* at 21 ¶ 55(a), 31 ¶ 88. L.H. believes Nicholas paid for one night's stay with a credit card. *Id.* at 31 ¶ 89. Then, Varney and Nicholas took L.H. up to their room to take and upload more photographs and advertisements to Backpage.com and escorts.com, using the hotel's Wi-Fi connection. *Id.* at ¶ 91.

At this time, L.H. again expressed a desire to leave, and Varney again physically blocked L.H.'s exit and became loud and confrontational with her.  *Id.* at ¶ 91.  A short time later, a hotel employee came to the room and said he had received a complaint about the smell of cigarette and marijuana smoke and that they would have to leave if another such complaint were received.  *Id.* at ¶ 92.  L.H. was kept at the Baymont hotel for approximately five hours.  *Id.* at 32 ¶ 93.  During that time, she was forced to provide commercial sex to three to four johns.  *Id.* at ¶ 94.  While L.H. was being trafficked, other people entered the room and smoked marijuana while engaging Varney in conversation.  *Id.* at ¶ 95.  About twenty minutes later, the same hotel staff member returned and asked them to leave based on complaints about the smell of marijuana use.  *Id.* at ¶ 96.

After the Baymont hotel, L.H. was taken to a second Red Roof property, this one located at 3322 Red Roof Inn Place in Louisville.  *Id.*  She does not know how this room was paid for.  *Id.* at ¶ 97.  L.H. noted that used condoms, tourniquets, and syringes were strewn throughout the property, which she claims are "indicative of high amounts of illicit drug and commercial sex activity."  *Id.* at ¶ 98.  At check-in, towels were pre-ordered for the room, so that hotel housekeeping staff would not need to enter the room.  *Id.* at ¶ 99.

Soon after checking in, L.H.'s traffickers posted pictures of her on Backpage.com and escorts.com using the hotel Wi-Fi connection and advertised her for commercial sex.  *Id.* at ¶ 100.  L.H. was kept at this Red Roof property for two to three days, during which time she was forced to perform commercial sex acts with approximately 30 johns, all of whom she alleges "had to pass through the lobby and front desk, as well as numerous hotel rooms, in order to access Plaintiff's room located at the back of the hotel."  *Id.* at ¶ 101.

L.H. was tasked with collecting the payment from the johns and then giving all the money to her trafficker by placing it in the hotel nightstand for the trafficker to retrieve.  *Id.* at ¶ 102.  She

was not allowed to keep any of the funds and was never given any of the funds. *Id.* at 33 ¶ 103. On one occasion, a john stole his money back while L.H. was getting dressed and left without payment, causing L.H.'s trafficker to become enraged and berate L.H. in a loud, profane fashion. *Id.* at ¶ 104. On another occasion, a female housekeeping worker was permitted to enter L.H.'s room and observed L.H. looking pale and sick, prompting the worker to look at L.H. curiously. *Id.* at ¶ 105. However, the worker did not inquire as to L.H.'s wellbeing and, to L.H.'s knowledge, did not make any type of report to anyone regarding L.H.'s condition or activity. *Id.*

After a few days at the second Red Roof property, L.H.'s traffickers stated the hotel was getting "hot," so they took her to several private residences and an unknown hotel in Indiana, where she was sexually assaulted by one of her trafficker's friends. *Id.* at ¶ 106. During this time, L.H.'s physical condition continued to worsen. *Id.* at ¶ 107. One day, L.H. awoke to hotel staff knocking on her door, telling her she had to leave because the rest of her party had checked out. *Id.* at ¶ 108. After L.H. could not reach anyone by phone and experienced difficulty maintaining consciousness, she called 911 and disclosed that she was a sex trafficking victim in need of help. *Id.* at ¶ 109.

L.H. was transported by EMS to an unknown hospital in Indiana, where she was treated for sepsis and dehydration and for chemical dependency relating to her use of marijuana and crack cocaine furnished to her by her traffickers, "who used the common sex trafficker tactic of fostering chemical dependency within their victims as a means of establishing control and compliance." *Id.* at ¶ 110. Police arrived within five to ten minutes of L.H.'s arrival at the hospital, but she was too sick and weak to give an interview at that time. *Id.* at 34 ¶ 111.

Subsequently, L.H. was transferred to another unknown hospital in Kentucky, where her condition improved enough for her to give a statement to law enforcement. *Id.* at ¶ 112. By April

2018, Burris, Nicholas, and Varney were arrested and charged with various crimes, including sexual abuse and sex trafficking of minors. *Id.* at ¶ 113. In November 2021, they each were sentenced to five years in prison for their crimes. *Id.* at ¶ 114.

L.H.'s Complaint contains three causes of action, each alleging a respective violation of the TVPRA by Red Roof, Wyndham, and Club NO. *See id.* at 36-40. Through these causes of action, L.H. claims that the Defendant hotels failed to take reasonable measures to stop sex trafficking at their properties and that they "profited from the sex trafficking of L.H. and knowingly or negligently aided and engaged with her traffickers in his sex trafficking venture" in violation of federal law. *Id.* at 34 ¶ 115.

Notably, L.H. has not sued the individual hotel locations at which she was trafficked, but the "parent hotel brand[s]." *See id.* at 15 ¶¶ 50-51 (describing Red Roof as owning and controlling the "Red Roof Inn® brand," Wyndham as owning and controlling the "Baymont® brand," and Club NO as owning and controlling the Louisville Manor Adult Hotel). In this regard, she alleges that the Defendant hotels were in actual or apparent agency relationships with their local "hotels offering public lodging services in the hotel." *Id.* at 16 ¶ 54(f), 21-22 ¶ 55(e), 26 ¶ 56(e). Further, she alleges that these agency relationships were created through the companies' "exercise of an ongoing and systemic right of control over" their local hotels through certain actions, including hosting online bookings on the Defendant hotels' domains, requiring local hotels to use brand loyalty programs, setting employee wages, making employment decisions, advertising for employment, sharing profits, standardized training methods for employees, building and maintaining the facility in a manner specified by the owner, standardized or strict rules of operation, regular inspection of the facility and operation by the owner, fixing prices, or other actions that deprive the local hotels of independence in business operations. *See, e.g.*, *id.*

- 7 -

Additionally, the Complaint alleges that the Defendant hotels control the training and policies for their hotels and that, through their relationships with staff at the properties at which L.H. was trafficked and with the hotel guest perpetrator, they "knowingly benefitted, or received something of value, from [their] facilitation of, or participation in, a venture which [they] knew or should have known to engage in sex trafficking." *Id.* at 3 ¶ 11(d), 5 ¶ 12(e), 6 ¶ 13(c). The Complaint describes the percentage of revenue the Defendant hotels obtained from their properties and alleges that the Defendant hotels have all "been on notice of repeated incidences of sex trafficking occurring at their hotels yet failed to take the necessary action to prevent sex trafficking and still persist in failing to take the necessary action to prevent sex trafficking at their hotels." *Id.* at 15 ¶ 53; *see also id.* at 4 ¶ 11(e), 5 ¶ 12(f), 6 ¶ 13(d) (revenue allegations); *id.* at 18, 23, 27 (alleging the Defendant hotels failed to take certain actions, including training their employees in identifying human trafficking, providing a process for escalating human trafficking concerns within the organizations, and monitoring usage of the hotels' Wi-Fi).

The Complaint ascribes notice to the Defendant hotels through various methods, including news stories about prostitution at local hotels, customer reviews, and, in the case of Red Roof, corporate policies that require local hotels and staff to report signs of human trafficking. *See, e.g.*, *id.* at 18-27. Additionally, L.H. alleges that the Defendant hotels:

> knew, or should have known, that L.H. was being trafficked because L.H.'s traffickers paid for her room using cash, refused housekeeping services and/or requested services to dispose of trash filled with condoms, frequently requested extra towels and sheets, constantly entertained an absurd amount of foot traffic from male visitors every day, and checked in with an underage girl; behavior that indicated that Defendants' hotels were being used for an illegal sex trafficking venture.

*Id.* at 34 ¶ 117.

Procedurally, the Defendants each filed separate responsive pleadings or motions to L.H.'s Complaint. Defendant Club NO filed an Answer [R. 10], and Defendants Red Roof and Wyndham each filed Motions to Dismiss [R. 14; R. 20]. The Motions to Dismiss are fully briefed and ripe for review.

## II.    Legal Standard

Red Roof's and Wyndham's Motions to Dismiss are based on Federal Rule of Civil Procedure 12(b)(6). When ruling on a motion to dismiss under Rule 12(b)(6), the Court "must (1) view the complaint in the light most favorable to the plaintiff and (2) take all well-pleaded factual allegations as true." *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (per curiam). Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Relatedly, under Rule 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (cleaned up).

## III.    Analysis

L.H.'s Complaint states that this action has been brought "pursuant to the Trafficking Victims Protection Reauthorization Act 18 U.S.C. §1595, against the Defendants who enabled, harbored, held, facilitated, and financially benefited from a sex trafficking venture in which L.H. was trafficked for the purpose of commercial sex, sexually exploited, and brutally victimized in violation of 18 U.S.C. §1591(a)." [R. 1, p. 2 ¶ 8]. As an initial observation, there is little binding

precedent to guide the Court's consideration of L.H.'s TVPRA claims.  *See J.M. v. Choice Hotels Int'l, Inc.*, No. 2:22-CV-00672-KJM-JDP, 2022 WL 10626493, at *1 (E.D. Cal. Oct. 18, 2022) ("[F]ederal district courts across the country are tackling these suits and interpreting the TVPRA on a case-by-case basis.").  Similarly, courts take widely different approaches when deciding whether claims such as those presented in L.H.'s Complaint can survive a motion to dismiss, even when presented with substantially similar facts.  *Compare, e.g.*, *id.* with *H.G. v. Inter-Cont'l Hotels Corp.*, 489 F. Supp. 3d 697, 703-04 (E.D. Mich. 2020).

"The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1591, prohibits the sex trafficking of children or adults by force, fraud, or coercion."  *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 723 (11th Cir. 2021).  "In addition to that criminal prohibition, the Act provides sex-trafficking victims with a civil cause of action against 'the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter).'"  *Id.* (quoting 18 U.S.C. § 1595(a)).  In this case, L.H. "does not allege that Defendants are perpetrators of sex-trafficking.  Rather, she seeks relief under the beneficiary theory."  *C. T. v. Red Roof Inns, Inc.*, No. 2:22-CV-834-JES-KCD, 2023 WL 3510879, at *2 (M.D. Fla. Mar. 11, 2023); *see* [R. 1, p. 34 ¶ 115 ("Defendants RRI, Wyndham, and Club NO profited from the sex trafficking of L.H. and knowingly or negligently aided and engaged with her traffickers in his sex trafficking venture.  The Defendants leased rooms to L.H.'s traffickers for hours to days at a time, when they knew, or should have known, that they were using the hotel room to imprison L.H. and subject her to repeated exploitation by forcing her into sexual servitude.")].

"[T]o state a claim for beneficiary liability under the TVPRA, a plaintiff must plausibly allege that the defendant (1) knowingly benefited (2) from taking part in a common undertaking

or enterprise involving risk and potential profit, (3) that the undertaking or enterprise violated the TVPRA as to the plaintiff, and (4) that the defendant had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to the plaintiff." *Doe #1*, 21 F.4th at 719; *see also, e.g.*, *G.G. v. Salesforce.com, Inc.*, --- F.4th ---, 2023 WL 4944015, at *5 n.5 (7th Cir. Aug. 3, 2023) ("reorganiz[ing] the most common summaries of these elements to follow a logical sequence rather than the sequence of the phrases in Section 1595"); *H.G.*, 489 F. Supp. 3d at 704 (describing a claim under the financial beneficiary prong of the TVPRA as having three elements: (1) that the defendant knowingly benefitted, (2) from participation in a venture, (3) which the defendant knew or should have known has engaged in sex trafficking).

A plaintiff may satisfy the elements of a TVPRA claim "in one of two ways." *H.G.*, 489 F. Supp. 3d at 704. First, "[s]he may show that the defendant's own acts, omissions, and state of mind establish each element." *Id.* "Alternatively, she may impute to the defendant the acts, omissions, and state of mind of an agent of the defendant." *Id.* "The former is referred to as 'direct liability' and the latter as 'indirect liability.'" *Id.*; *see also J.M.*, 2022 WL 10626493, at *3 (describing the former as "direct beneficiary liability" and the latter as "vicarious beneficiary liability").

### A.    Direct Beneficiary Liability Claims

L.H. first alleges a theory of direct liability against Red Roof and Wyndham. *See, e.g.*, [R. 1, p. 2 ¶ 7 ("As a direct and proximate result of Defendants' consistent refusals to prevent human trafficking on their hotel properties, L.H. was sex trafficked, sexually exploited, and victimized repeatedly at the Red Roof Inn®, Louisville Manor Adult Hotel, and the Baymont Hotel.")].  For this theory, L.H. highlights these Defendant hotels' training and policies for their hotel properties, their general knowledge that sex trafficking occurs at their properties and in the hotel industry, and

their "demonstrated deeply entrenched apathy to the real risk of sex trafficking and pervasive willful blindness to the role" their local hotels "play in sex trafficking." *See, e.g.*, *id.* 8-13 ¶¶ 20-45, 16 ¶ 54(a)-(j), 18-20 ¶ 54(j)-(n), 21 ¶ 55(a)-(i).  These general allegations are insufficient.

As explained by the court in *J.M.*, for a direct liability claim, a plaintiff must "connect the dots" between her and a franchisor to satisfy the "participation in a venture" element and she must allege more than "general knowledge of sex trafficking problems in the hotel industry, or even at defendants' franchisee hotels" for the knowledge element.  *See J.M.*, 2022 WL 10626493, at *4-5.  In this case, L.H.'s allegations are insufficient.  Indeed, although her factual allegations would sufficiently allege circumstances supporting direct liability against the *franchisee* hotels or potentially vicarious liability claims against the Defendant hotels, they do not support a theory of direct liability against Red Roof or Wyndham.

When courts have permitted direct liability claims to proceed, they were presented with stronger facts "connecting the dots" than those presented here.  For example, in *T.P. v. Wyndham Hotels & Resorts*, the plaintiff alleged she was trafficked at various hotel properties in Columbus, Ohio, from 1993 to 2016.  *T.P. v. Wyndham Hotels & Resorts, Inc.*, No 2:21-CV-04933, 2022 WL 17363234, at *1 (S.D. Ohio Dec. 1, 2022).  Additionally, she alleged behavior that hotel staff should have recognized as clear signs of her trafficking, that the owner of two local hotels traded free or discounted rooms to her traffickers in exchange for sex acts from her, that one of the properties had been declared a "public nuisance" by the Columbus City Attorney for being a "haven for prostitution," and that online reviews specifically referenced several of the local hotels as being full of drug dealers, pimps, and hookers.  *See id.*  On these facts, the Southern District of Ohio found the plaintiff had plausibly alleged each element of a direct liability TVPRA claim against the franchisor defendants.  *See id.* at *11; *see also M.A. v. Wyndham Hotels & Resorts,*

*Inc.*, 425 F. Supp. 3d 959, 971 (S.D. Ohio 2019) (finding plaintiff sufficiently alleged direct liability claims against franchisor defendants).

In this case, by contrast, the allegations L.H. has presented do not sufficiently connect the actions of the Defendant hotels to each element of her TVPRA direct liability claims.[5]   In this regard, both the general allegations regarding sex trafficking in the hospitality industry and the specific allegations of L.H.'s own trafficking fail to plausibly establish a direct liability claim against either Red Roof or Wyndham.   For instance, although she alleges the Louisville Metro Council was informed in February 2022 of the high percentage of calls received by the Louisville Metro Police Department for incidents occurring at the two Red Roof properties in this case, those calls were from January 2020 to January 2021, two to three years *after* L.H.'s trafficking is alleged to have occurred in 2018.  *See* [R. 1, p. 25 ¶ 55(i)(iii)].   Relatedly, the limited duration of time that L.H. alleges she was held at the Baymont property does not sufficiently tie Wyndham's own actions to the elements of her direct liability TVPRA claim.

On this Complaint, the Court finds that L.H. has failed to plausibly allege that these Defendant hotels' "own acts, omissions, and state of mind establish each element."  *H.G.*, 489 F. Supp. 3d at 704.  By way of example, she has not plausibly alleged that "the franchisor defendants directly rented rooms and Wi-Fi to her buyers and sex traffickers" or that they ignored internal reports of her own sex-trafficking.  *See J.M.*, 2022 WL 10626493, at *4.  Therefore, to the extent L.H. bases her TVPRA claims against Red Roof and Wyndham on a theory of direct liability, the Defendant hotels' Motions to Dismiss will be granted.  Still, as will be explained below, her factual allegations support a theory of vicarious liability, at least as to Red Roof.

---

[5] The Court observes that the facts regarding the "participation in a venture" and knowledge elements often overlap.  Thus, the Court addresses L.H.'s allegations supporting her direct liability claims broadly because, under either element, they are insufficient.

### B.       Vicarious Beneficiary Liability Claims

Having disposed of L.H.'s claims against Red Roof and Wyndham based on a theory of direct liability, the Court considers her vicarious liability claims against these Defendant hotels. Here, L.H. ascribes liability to the Defendant hotels based on their actual or apparent agency relationships with their local hotels.  *See* [R. 1 pp. 16-17, 21-22].

As a preliminary matter, "[t]here is a split of authority with respect to whether state common law or federal common law applies to the question of whether a party can be held indirectly liable under the TVPRA based on an agency relationship."  *H.G.*, 489 F. Supp. 3d at 708 n.6.   Under Kentucky law, "[a] franchisor is vicariously liable for the tortious conduct of the franchisee when it, in fact, has control or right of control over the daily operation of the specific aspect of the franchisee's business that is alleged to have caused the harm."  *Papa John's Int'l., Inc. v. McCoy*, 244 S.W.3d 44, 56 (Ky. 2008).   And courts, like those in the Ninth Circuit, have applied federal common law agency principles from the Restatement (Third) of Agency to TVPRA claims.  *See A.B. v. Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d 921, 940 (D. Or. 2020) ("An actual agency relationship requires (1) a manifestation by the principal that the agent shall act for him; (2) that the agent has accepted the undertaking; and (3) that there is an understanding between the parties that the principal is to be in control of the undertaking.") (internal quotation marks omitted).   The parties in this case did not brief this split of authority.

Nonetheless, the Court finds that L.H. has plausibly alleged an agency relationship under both sources of law.   Indeed, the Complaint contains multiple allegations regarding L.H.'s agency theory, including that franchisor hotels provide their local hotels with brand recognition, marketing organization, listing in travel agency databases, an 800 number, revenue management tools, world-class loyalty programs, and a website, and that, through their actions, the Defendant hotels hold

out their local hotels "to the public as possessing authority to act on [their] behalf." *See* [R. 1, pp. 3-4 ¶ 11, 4-5 ¶ 12, 14 ¶ 48, 15-17 ¶¶ 53-54, 20 ¶ 55]. Further, the Complaint included specific allegations regarding Red Roof's and Wyndham's control over how their local hotels "conduct[ed] daily business" through various actions, including by setting employee wages, fixing profits, and making employment decisions. *See id.* at 17 ¶ 54(f) , 22 ¶ 55(e).

Notably, similar allegations "have been found sufficient to support a plausible inference of an agency relationship" by other courts. *See C.T. v. Red Roof Inns, Inc.*, 2:22-CV-834-JES-KCD, 2023 WL 3510879, at *3 (M.D. Fla. Mar. 11, 2023) (collecting cases); *see also J.M.*, 2022 WL 10626493, at *5 ("Here, J.M. alleges defendants exercised control over the day-to-day operations of the hotels by hosting online bookings, setting hotel employee wages, making employment decisions for the hotels, providing standardized training methods for hotel employees, and fixing hotel room rent prices. A majority of district courts have found nearly identical allegations sufficient to plead an agency relationship."). *But see H.G.*, 489 F. Supp. 3d at 704-09 (finding plaintiff had "not plausibly alleged that the franchisees were agents of Defendants"). Having concluded that L.H. has plausibly alleged an agency relationship, the Court will consider the elements of her vicarious liability claims against Red Roof and Wyndham.

### 1. Existence of a Venture

Through their Motions, Red Roof and Wyndham primarily argue that L.H. cannot show their "participation in a venture." *See* [R. 14, pp. 5-10; R. 20, pp. 4-10]. In their briefing, Red Roof and Wyndham first ask the Court to use the definition of "venture" found in § 1591(e)(6) (regarding criminal liability), informed by the RICO statute, for interpreting § 1595(a) (regarding civil liability). *See* [R. 14, p. 5; R. 20, pp. 4-5]. However, courts have routinely rejected imposing definitions from § 1591 to interpretation of § 1595. *See Doe #1*, 21 F.4th at 725 ("But most district

courts, like us, have rejected the idea that a court can transpose the definition of 'participation in a venture' from the criminal section to the civil cause of action.").

The rejection by other courts of the arguments made by Red Roof and Wyndham in this regard compels the Court to follow suit.  *See id.* at 724 (interpreting "participation in a venture" under § 1595 "according to its plain meaning" rather than the phrase "participation in a venture" from § 1591(e)(4)); *G.G.*, 2023 WL 4944015, at *10 ("We agree with the Eleventh Circuit that we should not import [§ 1591's] definition into Section 1595."); *C.T.*, 2023 WL 3510879, at *4 (rejecting argument that definition from § 1591(e)(6) should apply to § 1595); *Doe v. Rickey Patel, LLC*, No. 0:20-60683-WPD-CIV, 2020 WL 6121939, at *4 (S.D. Fla. Sept. 30, 2020) ("[T]he Court is not prepared to impose requirements to plead a RICO claim onto Plaintiff who is here pleading a claim for civil liability under the TVPRA.").  Instead, the Court looks to the plain meaning of the statutory text.  In doing so, the Court observes that other courts have interpreted "participation in a venture" in different ways.  *See generally J.M.*, 2022 WL 10626493, at *3 (observing that "district courts are all over the map on the meaning of ['participation in a venture']") (quoting *Doe #1*, 21 F.4th at 726).

In this case, the Court finds it helpful to first consider whether L.H. has plausibly alleged a "venture" before determining whether she has alleged "participation" in that venture.  *See G.G.*, 2023 WL 4944015, at *5 ("The first element is the existence of a venture which has engaged in an act in violation of Section 1591.") (cleaned up).  The Seventh Circuit has explained that "'venture' under Section 1595 need not be 'specifically a sex trafficking venture," and that, "[w]hile a 'venture' can certainly run the gamut from an isolated act of sex trafficking to an international sex-trafficking enterprise, it can also be a business whose primary focus is not on sex trafficking." *Id.* at *6.  And in *Doe #1*, the Eleventh Circuit determined that the plaintiffs' allegations regarding a

"sex trafficking venture" were insufficient to state a claim because the plaintiffs had not "plausibly alleged that the franchisors took part in the common undertaking of sex trafficking with hotel employees, management, owners, and sex traffickers." *Doe #1*, 21 F.4th at 726. However, courts have distinguished the "narrow" holding of *Doe #1* and permitted claims to survive dismissal when plaintiffs have alleged that "Defendants participated in commercial ventures to operate hotels that violated the TVPRA." *See C.T.*, 2023 WL 3510879, at *2.

On this Complaint, the Court concludes that L.H. has sufficiently plead a "venture" because she substantively alleges a commercial business venture by the Defendant hotels that violated the TVPRA. Indeed, the Complaint highlights the revenues the Defendant hotels obtained from their properties' operations, "including a percentage of the revenue generated from the rate charged for the rooms in which the Plaintiff was sex trafficked." [R. 1, pp. 4-5 ¶¶ 11(e), 12(f)]. Additionally, the Complaint alleges "[t]he Defendants leased rooms to L.H.'s traffickers for hours to days at a time, when they knew, or should have known, that they were using the hotel room to imprison L.H. and subject her to repeated exploitation by forcing her into sexual servitude," and it alleges a "relationship" by the Defendants with the staff at the hotel "properties where L.H. was trafficked and the hotel guest perpetrator who trafficked her" at those properties. *Id.* at 3 ¶ 11(d), 5 ¶ 12(e), 34 ¶ 115. These allegations focus on the business nature of the Defendants' actions and "plausibly allege that the venture in which the franchisors participated committed [crimes prohibited by the TVPRA] against [her]." *Doe #1*, 21 F.4th at 725.

Although L.H. repeatedly refers to a "sex trafficking venture" in her Complaint, *see, e.g.*, [R. 1, p. 2 ¶ 8], the Court must view the Complaint in the light most favorable to her. In doing so, the Court finds that L.H.'s allegations focus on the nature of the hotels' business operations, which are sufficient at this stage of the proceedings to satisfy the "venture" element. *See generally id.* at

34 ¶ 117 (referencing "behavior that indicated that *Defendants' hotels* were being used for an illegal sex trafficking venture") (emphasis added).

### 2. Participation in a Venture

Next, the Court must consider whether L.H. has plausibly alleged *participation* by Red Roof and Wyndham in the venture described above. Courts, again, phrase this element differently, with certain standards appearing more lenient than others. For example, the Eleventh Circuit has "conclude[d] that the phrase 'participation in a venture' requires that [a plaintiff] allege that the franchisors took part in a common undertaking or enterprise involving risk and potential profit." *Doe #1*, 21 F.4th at 725.

In *M.A.*, the Southern District of Ohio used a (potentially) heightened standard and concluded that, "[i]n the absence of a direct association, [a] Plaintiff must allege at least a showing of a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement." *M.A.*, 425 F. Supp. 3d at 970. Recently, the Seventh Circuit relied on *M.A.* in finding that "[t]o survive a motion to dismiss, all that is necessary is for a plaintiff to allege such a 'continuous business relationship,' which gives rise to an inference, drawn in the plaintiff's favor, that the civil defendant facilitated the venture's success." *See G.G.*, 2023 WL 4944015, at *11 ("Where the participant provides assistance, support, or facilitation to the trafficker through such a 'continuous business relationship,' a court or jury may infer that the participant and trafficker have a 'tacit agreement' that is sufficient for 'participation' under Section 1595.") (citing *M.A.*, 452 F. Supp. 3d at 970-71; *Ricchio v. McClean*, 853 F.3d 553, 555 (1st Cir. 2017)).

Although "participation in a venture" is not clearly defined by legal precedent, the Court is guided by the standard announced in *M.A.* Therefore, the Court considers whether L.H. has

plausibly alleged a "continuous business relationship" or "tacit agreement" between the Defendant hotels and her traffickers. At this point, the Court's consideration of Red Roof's and Wyndham's Motions to Dismiss diverges. The Court will address L.H.'s allegations against Wyndham first.

Here, the Complaint alleges that L.H. was only at the Baymont hotel for a period of five hours, that she was forced to provide commercial sex to three to four johns during that time, that her traffickers used hotel Wi-Fi to upload pictures of her to advertise her for commercial sex, that a hotel staff member warned the party about the smell of cigarette and marijuana smoke, and that the same staff member returned about twenty minutes later and directed the party to leave because of other individuals' complaints about the smell of marijuana. *See* [R. 1, pp. 31-32 ¶¶ 86-96]. The limited duration of L.H.'s time at the Baymont hotel coupled with the staff member's warning and subsequent and quick action to direct the party to leave do not show a continuous business relationship or tacit agreement between Wyndham and her traffickers. *See M.A.*, 925 F. Supp. 3d at 970; *see also G.G.*, 2023 WL 4944015, at *11. Accordingly, L.H. has failed to sufficiently plead that Wyndham "participated in a venture" as required to support her vicarious TVPRA claim against this company.[6] Wyndham's Motion to Dismiss will therefore be granted.

L.H.'s allegations against Red Roof, however, present a different story. Here, the Complaint alleges that L.H.'s traffickers took her to multiple Red Roof hotels for several days each time. Specifically, she alleges that she was held at the first Red Roof property by her traffickers for a "period of a few days" and at the second Red Roof property for "two to three days," that her traffickers chose to return to the second Red Roof property after being kicked out of other hotels, that one of her traffickers used the hotel's Wi-Fi connection to upload pictures of L.H. to advertise her for commercial sex, that she was forced to provide commercial sex to dozens

---

[6] However, even if the Court were to find the participation in a venture element satisfied for this claim, the knowledge element would be found lacking based on the same facts.

of johns at these properties, that the second Red Roof property was littered with used condoms, syringes, and tourniquets, and that a housekeeping staff member at the second property saw her looking pale and sick but took no action.  *See* [R. 1, pp. 29-30, 32-40].  The repeated interactions between L.H.'s traffickers and the two Red Roof properties within the span of about a month are sufficient, at the pleading stage, to show a "continuous business relationship" between Red Roof and her traffickers.  *See M.A.*, 425 F. Supp. 3d at 970; *G.G.*, 2023 WL 4944015, at *11.

### 3. Knowing Benefit

The Court must now consider the other elements of L.H.'s vicarious TVPRA claim against Red Roof.  First, regarding the "knowing benefit" element, L.H. has sufficiently alleged that Red Roof "knew it was receiving some value from participating in the alleged venture," namely the money from the rented rooms.  *See Doe #1*, 21 F.4th at 724; *M.A.*, 425 F. Supp. 3d at 965 ("M.A. has alleged that Defendants rented rooms to the trafficker, and therefore benefited financially.  This Court finds that the rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element of the § 1595(a) standard."); *see* [R. 1, p. 4 ¶ 11(e) ("Upon information and belief, RRI receives a percentage of the gross room revenue from the money generated by the operations of all Red Roof Inn® hotels, including a percentage of the revenue generated from the rate charged for the rooms in which the Plaintiff was sex trafficked.")].

### 4. Knowledge of Plaintiff's Trafficking

Similarly, the Court concludes L.H. has satisfied the final element regarding whether Red Roof had "knowledge that the undertaking or enterprise violated the TVPRA as to the plaintiff." *Doe #1*, 21 F.4th at 719.  The knowledge element is informed by the allegations L.H. has included in her Complaint suggesting an agency relationship between Red Roof and its local hotels at which she was trafficked.  *See* [R. 1, p. 17 ¶ 54(f)]; *see also C.T.*, 2023 WL 3510879, at *5 ("For example,

Plaintiff alleges facts that would have put Best Western, through its agency relationship with the hotel, on notice as to her trafficking[.]").

> In her Complaint, L.H. globally claims that the Defendants:
>
> knew, or should have known, that L.H. was being trafficked because L.H.'s traffickers paid for her room using cash, refused housekeeping services and/or requested services to dispose of trash filled with condoms, frequently requested extra towels and sheets, constantly entertained an absurd amount of foot traffic from male visitors every day, and checked in with an underage girl; behavior that indicated that Defendants' hotels were being used for an illegal sex trafficking venture.

*See* [R. 1, p. 34 ¶ 117].  And she provides further specific facts relating to her repeated stays at the Red Roof hotels, including: that the number of johns she was forced to provide commercial sex to would have led to significant foot traffic to her rooms; that her traffickers used the local hotel's Wi-Fi connection to upload pictures to advertise her for commercial sex; that used condoms, tourniquets, and syringes were strewn throughout the second Red Roof property, which she claims are "indicative of high amounts of illicit drug and commercial sex activity"; that, at check-in at the second Red Roof location, towels were pre-ordered for the room, so hotel housekeeping staff would not need to enter the room; and that a housekeeping staff saw L.H. looking pale and sick at the second Red Roof property, but did not inquire as to her condition.  *Id.* at 30-31 ¶¶ 75-85, 32-34 ¶¶ 97-105.

Although the Court finds these allegations insufficient to state a claim of actual knowledge by Red Roof, it concludes that L.H. has sufficiently plead that Red Roof *should have known* about the sex trafficking venture.  *M.A.*, 425 F. Supp. 3d at 968.  To parrot the court in *M.A.*, L.H. has alleged that Red Roof was on notice, through its local hotels (*i.e.*, its agents), about the prevalence of sex trafficking generally at its hotels and failed to take adequate steps to train staff in order to prevent its occurrence.  *Id.*  But more than that, she has alleged "facts specific to her own sex

trafficking, including a number of signs she alleges should have alerted staff to her situation," including those just discussed about the number of johns she was forced to provide commercial sex to and the conditions of the Red Roof properties at which she was trafficked. *Id.*

Courts have found similar allegations "sufficient to survive a 12(b)(6) motion to dismiss," and this Court will as well. *See id.*; *see also C.T.*, 2023 WL 3510879, at *5 (finding allegations detailing "many signs of human trafficking and commercial sex activity," including "physical deterioration, no eye contact, and duration of stay and bottles of lubricants, boxes of condoms, used condoms in the trash, excessive requests for towels and linens, cash payments" as "sufficient to show knowledge"). Because L.H. has sufficiently alleged each element of her vicarious TVPRA liability claim against Red Roof, this claim will survive Red Roof's Motion to Dismiss.

## IV.    Conclusion

For the foregoing reasons, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1. Defendant Red Roof's Motion to Dismiss Plaintiff's Complaint [R. 14] is **GRANTED** in part and **DENIED** in part. Specifically, Red Roof's Motion is granted regarding L.H.'s direct liability claim against it under the TVPRA, but the Motion is denied regarding her vicarious liability claim against it.

2. Defendant Wyndham's Motion to Dismiss Plaintiff's Complaint [R. 20] is **GRANTED**.

This the 5th day of September, 2023.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY